IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOHNNY GENE REYNOLDS                                    PLAINTIFF

   v.                    CIVIL NO. 15-5058

CAROLYN W. COLVIN, Acting Commissioner,
Social Security Administration                          DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Johnny Gene Reynolds, brings this action pursuant to 42 U.S.C. § 405(g),
seeking judicial review of a decision of the Commissioner of the Social Security
Administration (Commissioner) denying his claim for a period of disability and disability
insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act). In
this judicial review, the Court must determine whether there is substantial evidence in the
administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

I.  **Procedural Background:**

Plaintiff protectively filed his current application for DIB on March 16, 2012, alleging
an inability to work since January 1, 2008, due to residuals of a stroke, diabetes, enlarged
prostate, gout, pancreatitis, and memory problems. (Tr. 159, 186). For DIB purposes, Plaintiff
maintained insured status through June 30, 2011. (Tr. 186). An administrative hearing was
held on July 31, 2013, at which Plaintiff appeared with counsel and testified. (Tr. 22-52). Jim

B. Spragins, Vocational Expert (VE), and Rahmlee Price Reynolds, Plaintiff's son, also testified. (Tr. 64-67, 69-73).

In a written opinion dated October 11, 2013, the ALJ found that the Plaintiff had the following severe impairments: osteoarthritis/degenerative disc disease of the cervical and lumbar spine with chronic neck and back pain; Diabetes Mellitus; hypertension; chronic kidney disease; and episodic gout. (Tr. 10). However, after reviewing the evidence in its entirety, the ALJ determined that the Plaintiff's impairments did not meet or equal the level of severity of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). (Tr. 12). The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform the full range of light work as defined in 20 CFR 404.1567(b). (Tr. 12). With the help of VE testimony, the ALJ also determined that Plaintiff would be able to perform his past relevant work. (Tr. 18). Ultimately, the ALJ concluded that the Plaintiff had not been under a disability within the meaning of the Social Security Act during the relevant time period, which was January 1, 2008, through June 30, 2011, the date last insured. (Tr. 18).

Subsequently, on October 11, 2013, Plaintiff requested a review of the hearing decision by the Appeals Council. (Tr. 1-4). His request was denied on January 16, 2015. (Tr. 1-4). Plaintiff filed a Petition for Judicial Review of the matter on March 2, 2015. (Doc. 1). Both parties have submitted briefs, and this case is before the undersigned for report and recommendation. (Docs. 10, 11).

The Court has reviewed the transcript in its entirety. The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

2

## II.    Evidence Submitted:

At the hearing before the ALJ on July 31, 2013, Plaintiff testified that he was born in 1957 and had a high school education. (Tr. 28). Plaintiff's past relevant work consists of work as a retail sales clerk. (Tr. 30).

Before the relevant time period, Plaintiff was seen by various healthcare providers for the following health issues: hemorrhoid issues and related rectal surgery (Tr. 521-522); insomnia (Tr. 524); chronic neck pain (Tr. 524); low back pain (Tr. 519); wrist and hand sprain (Tr. 519); acute pancreatitis (Tr. 513-514); Type II Diabetes Mellitus (Tr. 513-514); narcotic dependence (Tr. 513-514); hypertension (Tr. 529); hyperlipidemia (Tr. 536); anxiety syndrome (Tr. 538); low testosterone (Tr. 542); osteoarthritis (Tr. 543); diabetic neuropathy (Tr. 550); hypothyroidism (Tr. 552); fatigue (Tr. 555); severe headaches (Tr. 555); muscular and joint pain (Tr. 560); chronic kidney disease secondary to Diabetes Mellitus (Tr. 211-212, 214); acute renal failure (Tr. 214); acute bronchitis (Tr. 373); and a urinary tract infection (Tr. 374-376).

Also prior to the relevant time period, Plaintiff was provided numerous pain medication prescriptions by Dr. Mark F. Olsen.  Those medications include Methadone, Dilaudid, Tylox (Tr. 522), Duragesic patches (Tr. 533) and OxyContin (Tr. 543).  Dr. Olsen noted in his records that he was reluctant to continue to prescribe Plaintiff pain medication and suggested Plaintiff visit a pain management clinic.  (Tr. 392).  In addition to the pain medication, Plaintiff received the following prescriptions for other health conditions: Ambien (Tr. 524); Metformin (Tr. 541); zinc (Tr. 542); Diazepam (Tr. 549); Benicar (Tr. 563-564); and Vitamin D (Tr. 560).

Medical evidence during the relevant time period reflects the following.  On January 3, 2008, Plaintiff complained of shoulder pain from a recent bone scan.  Dr. Olsen's notes

reflected that a previous NCV showed cervical radiculopathy.  He diagnosed him with cervical radiculopathy and shoulder pain. (Tr. 386, 390). On February 1, 2008, Plaintiff's pain was worsening, and Dr. Olsen ordered a MRI of his c-spine.  (Tr. 391). The February 6, 2008, MRI showed post previous C5-C7 fusion; moderate degenerative disc disease at C3-C4 and C4-5 with annular disc bulging and mild bilateral uncovertebral joint spurring; no focal disc protrusion extruded disc fragment, central canal stenosis, cord compression, cord enlargement or cord syrinx; moderate degenerative disc disease at the cervical thoracic junction; and normal craniocervical junction and no pathologic marrow signal intensity arising from the vertebral bodies that would suggest bony metastatic disease or healing trauma.  (Tr. 369).

On March 20, 2008, Dr. Olsen's office notes reflect that Plaintiff was having pain in his back, neck, shoulder, foot, and ankle.  Dr. Olsen noted that Plaintiff requested more OxyContin, but Dr. Olsen was not comfortable giving it to him. Dr. Olsen suggested Plaintiff visit a pain management clinic if he needed more pain medication.  (Tr. 392). On March 27, 2008, Plaintiff requested that Dr. Olsen write a letter to assist him with his disability claim, and Dr. Olsen's notes reflect that a letter was written.[1] In May of 2008, Plaintiff had lab work done, and he saw Dr. Olsen for pain in his abdomen on the right side and severe heart burn. (Tr. 394).  The lab work ordered by Dr. Olsen was normal except for low testosterone levels, for which Plaintiff was prescribed medication.  (Tr. 395).

On July 27, 2008, Plaintiff was seen at the Northwest Medical Center Emergency Room for abdominal pain, nausea, and vomiting and was diagnosed with acute pancreatitis.  (Tr. 323). An x-ray of Plaintiff's abdomen showed no evidence of obstruction (Tr. 318), and an

---

[1] There is no letter from Dr. Olsen in the record.

ultrasound showed sludge in the gallbladder and a pancreas totally obstructed by bowel gas. (Tr. 319). On July 31, 2008, Plaintiff saw Dr. Olsen for a follow up after his hospital visit, and Dr. Olsen was waiting to review the blood work from the hospital. (Tr. 397).

During an October 16, 2008 office visit, Dr. Olsen refilled Plaintiff's Methadone and Dilaudid and noted some possible depression following Plaintiff's mother and aunt being taken into full time nursing home care.  (Tr. 398). In November of 2008, Plaintiff requested additional pain medication from Dr. Olsen that would alleviate some of his pain during an upcoming dental procedure, and Dr. Olsen suggested Plaintiff take OxyContin instead of Dilaudid. (Tr. 399). Plaintiff's December of 2008 lab work showed low testosterone levels, and Dr. Olsen suggested he restart his medication to increase the levels. (Tr. 401).

In March of 2009, Dr. Olsen recommended that Plaintiff switch from Dilaudid to OxyContin for breakthrough pain for his back and neck. (Tr. 403). During a May 18, 2009 office visit, Plaintiff was given a "Depo" shot for pain in his back and neck, a consequence from recent yard work.  Dr. Olsen again suggested he see Dr. Brooks for pain management, but Plaintiff wanted to postpone that appointment for lack of insurance.  (Tr. 404).

On August 18, 2009, Plaintiff was seen at the Northwest Medical Center Emergency Room for foot pain.  An x-ray of his foot showed no fracture, but mild soft tissue swelling. (Tr. 308). A few days later on August 25, 2009, Plaintiff saw Dr. Olsen for gout.  Lab results showed a high uric acid level, and Dr. Olsen suggested starting Plaintiff on Allopurinol. (Tr. 406-407).

On September 16, 2009, Plaintiff visited the Northwest Medical Center Emergency Room in Springdale with complaints of lower back and hip pain.  (Tr. 292). Plaintiff was

5

discharged (Tr. 294) after an x-ray revealed his hip was normal (Tr. 298), a MRI showed degenerative changes with no evidence of acute bony injury (Tr. 299, 301), and an x-ray revealed no abnormality of his pelvis (Tr. 300). Plaintiff followed up with Dr. Olsen on October 7, 2009, and November 3, 2009, for medication refills. (Tr. 409, 410). Plaintiff's lab work was repeated in January of 2010 (Tr. 366), and he saw Dr. Olsen for a check-up for anxiety and depression, gout and hip pain. (Tr. 412). On September 16, 2010, Plaintiff saw Dr. Olsen for a flare up with gout, and Dr. Olsen suggested he take Allopurinol if the flare up continued. (Tr. 417).

On February 6, 2011, Plaintiff was seen in the Northwest Medical Center Emergency Room after police found him unconscious and slumped over the wheel of his car. (Tr. 269-276). Plaintiff was assessed with syncope, unintentional drug overdose with altered state of consciousness, hyperglycemia, and Diabetes Mellitus. (Tr. 275). Plaintiff left the hospital against medical advice. (Tr. 269). On February 8, 2011, Plaintiff was still lethargic and returned to the hospital. (Tr. 248, 260). Plaintiff complained of a headache and told hospital personnel that he took extra OxyContin, and then said he did not take them "today." (Tr. 248). During his hospital stay, the following tests revealed normal results: a chest x-ray (Tr. 370), a CT scan of his head (Tr. 371), a brain scan (Tr. 250, 253), and an EKG (Tr. 250).

On February 15, 2011, Plaintiff saw Dr. Olsen for complaints of sinus and chest congestion and coughing. He also discussed with Dr. Olsen the reason for his last hospital stay. Dr. Olsen's notes reflect that Plaintiff denied taking more medication than normal and that he "may have had a tia." His notes also reflect that if the "spell" reoccurs, he would refer Plaintiff to a neurologist. (Tr. 420). On June 6, 2011, Plaintiff saw Dr. Olsen for complaints of pain with pancreatitis, memory problems, and back pain. (Tr. 422).

The medical evidence after the relevant time period reflects the following.  On February 16, 2012, Plaintiff saw Dr. Olsen for prostate pain, and office notes reflect "special screening of malignant neoplasm of prostate."  (Tr. 347). On July 17, 2012, Plaintiff saw Dr. Olsen for what Plaintiff thought were headaches stemming from a previous incident where Plaintiff hit his head. (Tr. 452-453).

On July 16, 2012, a Psychiatric Review Technique was completed by Christal Janssen, Ph.D., who opined that there was insufficient evidence from which to derive any conclusions for the mental assessment.  (Tr. 433).  That conclusion was affirmed on October 26, 2012, by Kevin Santulli, Ph.D.  (Tr. 467). On July 20, 2012, Dr. Jerry Thomas opined that Plaintiff's alleged physical impairments were not severe prior to his date last insured.  (Tr. 456).  This assessment was affirmed by Dr. Dan Gardener on November 2, 2012.  (Tr. 473).

On August 5, 2013, Dr. Olsen completed a medical source assessment. In that assessment, he found that Plaintiff was limited to lifting/carrying less than ten pounds due to pain from cervical surgeries and pain in his feet from gout. (Tr. 571). He also stated that Plaintiff would be able to stand/walk two hours total in an eight-hour workday, and sit less than two hours in and eight-hour workday, while requiring frequent repositioning due to chronic pain.  Plaintiff was limited to no climbing, kneeling, crouching, stooping, crawling or occasional balancing.   The assessment indicated that Plaintiff was limited in reaching, handling, and pushing/pulling, due to pain and extremity weakness. (Tr. 572). Dr. Olsen also concluded that Plaintiff was restricted in exposure to heights, vibration, noise, fumes, moving machinery, humidity, temperature extremes, dust, chemicals, and other environmental restrictions, because of headaches.  Dr. Olsen opined that Plaintiff's conditions would impact his attendance, in that he would have a high rate of absenteeism, a need for unscheduled breaks,

a need for an at will sit/stand option, and right upper extremity weakness due to cervical surgeries.  (Tr. 573).

### III.   Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§

8

423(d)(3), 1382(3)(C).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. § 404.1520. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his RFC. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 404.1520.

**IV.    Discussion:**

Plaintiff makes the following arguments on appeal: 1) the ALJ erred in failing to fully develop the record, and 2) the ALJ erred in determining Plaintiff's RFC and evaluating the medical opinion evidence, in that he relied on his lay interpretation of medical findings where an informed medical opinion was necessary.

**A.    Insured Status:**

In order to have insured status under the Act, an individual is required to have twenty quarters of coverage in each forty-quarter period ending with the first quarter of disability. 42 U.S.C. § 416(i)(3)(B). Plaintiff last met this requirement on June 30, 2011. Regarding Plaintiff's application for DIB, the overreaching issue in this case is the question of whether

Plaintiff was disabled during the relevant time period of January 1, 2008, his alleged onset date of disability, through June 30, 2011, the last date he was in insured status under Title II of the Act.

In order for Plaintiff to qualify for DIB he must prove that, on or before the expiration of his insured status, he was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death. Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984). Records and medical opinions from outside the insured period can only be used in "helping to elucidate a medical condition during the time for which benefits might be rewarded." Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that the parties must focus their attention on claimant's condition at the time she last met insured status requirements).

**B.      Failure to Fully Develop the Record:**

The ALJ has a duty to fully and fairly develop the record. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995). The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press his case. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010). The ALJ, however, is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. "Reversal due to failure to develop the record is only warranted where such failure is unfair and prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995). "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).

After reviewing the entire record, the Court finds the record before the ALJ contained the evidence required to make a full and informed decision regarding Plaintiff's capabilities

during the relevant time period.  Accordingly, the undersigned finds the ALJ fully and fairly developed the record.

### C.    Subjective Complaints and Credibility Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards, 314 F.3d at 966.

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. In addressing Plaintiff's credibility, the ALJ noted that Plaintiff was able to participate in a three-to-four week training course from the area Agency on Aging in order to assist with the care of his mother, who was suffering from congestive heart failure, and his aunt, who was suffering from blindness.  Both ladies lived in a house next door to Plaintiff.  Plaintiff testified that on a daily basis, he would walk to their house, prepare a light breakfast for them, vacuum their floors, and do their laundry.  These duties would take him two or more hours a day.  (Tr. 28-29, 34-37).

Plaintiff testified at the hearing that he had two or three friends that would visit him every couple of weeks, but he tried to primarily keep his focus on his son and his school.  (Tr.

62-63).  Plaintiff testified that at the time of the hearing, he could not do anything for two hours at a time because of his back and his hands.  However, Plaintiff's function report, completed on October 15, 2012, which was after the relevant time period, reflects that on a daily basis, Plaintiff cares for his dogs with no assistance, maintains his own personal care, prepares his own microwave meals, watches television, and tends to his Koi pond. (Tr. 192-195). Plaintiff also needs no reminders, except for reminders to take medication, does his own laundry, mows the grass with his son, drives a car, goes out alone, shops in stores and on a computer for food, medication and clothing, counts change, and uses a checkbook and money order.  (Tr. 193-194). Plaintiff has no trouble getting along with authority figures and others, and spends time with other people four to five times a week.  (Tr. 195-197).  Plaintiff can walk 200 feet before resting for 10 to 15 minutes, and for the most part, can finish what he starts.   (Tr. 196).

With respect to Plaintiff's Diabetes Mellitus, the record demonstrates that while this condition was initially controlled by diet (Tr. 515), Metformin was prescribed in 2005 (Tr. 541), and the diabetes continued to be sufficiently controlled with the medication.  Specialists suggested that sufficient treatment for Plaintiff's past acute renal failure and current chronic kidney disease, caused by his diabetes and hypertension, was to avoid all non-steroidal anti-inflammatory drugs and remain hydrated. (Tr. 215). Plaintiff's hypertension was controlled with Benicar (Tr. 564), and his gout flare ups were controlled with Allopurinol, when Plaintiff could tolerate the medication (Tr. 406, 407, 409, 417). Moreover, Plaintiff's neck and back pain were managed with conservative treatment, such as prescription pain medication, steroid injections, and referrals to pain management clinics (Tr. 394, 396, 398, 404, 410, 414, 418-419, 421, 424, 453). Impairments that can be controlled with treatment or medication are not

disabling. See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (holding that an impairment controllable with treatment or medication is not considered disabling).

Although it is clear that Plaintiff suffers some degree of limitation, he has not established that he is unable to engage in any gainful activity. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

### D.    ALJ's RFC Determination and Weight of Physicians' Testimony

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In finding Plaintiff able to perform light work prior to the expiration of his insured status, the ALJ considered Plaintiff's subjective complaints, the medical records of his treating and examining physicians, and the evaluations of the examining and non-examining medical providers.  In making the RFC determination, the ALJ specifically addressed the assessment

completed by Dr. Olsen.  (Tr. 17). The ALJ determined that Dr. Olsen's assessment should be given little weight because it was inconsistent with the objective medical evidence.  (Tr. 17). He reasoned that none of Dr. Olsen's previous medical records included the limitations he set forth in his RFC assessment.

In addition, the ALJ discussed a February of 2008 MRI of Plaintiff's c-spine, which revealed a "status post previous C5 through C7 fusion, moderate degenerative disc disease at C3-4 and C4-5 with an associated disc bulging and mild bilateral unconvertebral joint spurring, and moderate degenerative disc disease at the cervical thoracic junction as well." (Tr. 15, 369). He also highlighted imaging from a September 16, 2009 visit to the emergency room.  The imaging was of Plaintiff's hip and low back and revealed that both were negative for acute problems.  (Tr. 298-301).  A normal CT of Plaintiff's head and a normal EKG, from a February 6, 2011 visit to the emergency room, were also discussed.  In addition, the Court notes that Dr. Olsen's RFC assessment is dated more than two years after the relevant time period, and he gives no indication that his findings relate to the relevant time period.  To determine if a treating physician's opinion should control, "[t]he record must be evaluated as a whole" and the opinion must not be "inconsistent with the other substantial evidence." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).  A treating physician's opinion may be discounted or entirely disregarded "where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  Cline v. Colvin, 771 F.3d 1098, 1103 (8th Cir. 2014).

Throughout the years of treatment by Dr. Olsen, he never placed any limitations on Plaintiff's ability to work at light duty, or prohibited him from working at all.  See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physician-imposed restrictions militates

against a finding of total disability).  Moreover, the ALJ determined that Dr. Olsen's RFC assessment was based primarily on Plaintiff's subjective complaints.  See Cline, 771 F.3d at 1104 ("The [commissioner] was entitled to give less weight to Dr. [Allen's] opinion, because it was based largely on [Cline's] subjective complaints rather than on objective medical evidence.") (citing Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007)).

Moreover, based on the medical evidence of record, the ALJ considered, but declined to give great weight to Dr. Thomas' assessment, wherein he found Plaintiff's impairments to be non-severe. (Tr. 456). The ALJ determined that based on the record as a whole, Plaintiff had some physical limitations as of his date last insured, which was reflected in the RFC.  (Tr. 17).

Upon careful review of the record, the Court finds substantial evidence supports the ALJ's RFC determination for the time period in question.

**E.    Past Relevant Work**

Plaintiff has the initial burden of proving that he suffers from a medically determinable impairment which precludes the performance of past work.  Kirby v. Sullivan, 923 F.2d 1323, 1326 (8th Cir. 1991).   Only after the claimant establishes that a disability precludes performance of past relevant work will the burden shift to the Commissioner to prove that the claimant can perform other work.  Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir. 1993).

According to the Commissioner's interpretation of past relevant work, a claimant will not be found to be disabled if he retains the RFC to perform:

> 1.  The actual functional demands and job duties of a
> particular past relevant job; *or*

15

2.    The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

20 C.F.R. §§ 404.1520(e); S.S.R. 82-61 (1982); Martin v. Sullivan, 901 F.2d 650, 653 (8th Cir. 1990)(expressly approving the two part test from S.S.R. 82-61).

Here, the ALJ specifically found that prior to the expiration of his insured status, Plaintiff could return to his past relevant work as a retail sales clerk. (Tr. 18).  In doing so, the ALJ relied upon the opinion of the VE, who opined that Plaintiff's past relevant work as a retail sales clerk was considered light work in the Dictionary of Occupational Titles. See Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("The testimony of a vocational expert is relevant at steps four and five of the Commissioner's sequential analysis, when the question becomes whether a claimant with a severe impairment has the residual functional capacity to do past relevant work or other work") (citations omitted).  Plaintiff testified that as a retail sales clerk at County Line Liquor, he checked out patrons and bagged their purchases, while lifting nothing over 10 pounds or a 12-pack of drinks.  (Tr. 30-35).  Plaintiff further testified that the register provided him with the amount of change due, that he was not required to go into the cooler because of his back pain, and that he was not required to stock shelves, load or unload deliveries.  (Tr. 34-35).  Accordingly, the Court finds substantial evidence to support the ALJ's finding that Plaintiff could perform his past relevant work as a retail sales clerk, as he generally performed it and as that job is generally performed.

V.    **Conclusion:**

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of**

our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 16th day of February, 2016.


/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

17